PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| P.I. & I. MOTOR EXPRESS, INC., | ) | |
| | ) | CASE NO.  4:19CV1008 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| RLI INSURANCE COMPANY, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |
| | ) | [Resolving ECF No. 67] |

Pending before the Court is Defendant's Motion for Summary Judgment.  ECF No. 67.

The motion is fully briefed.  In addition to Plaintiff's response in opposition (ECF No. 69) and

Defendant's reply in support (ECF No. 76), the Court solicited, and has reviewed, briefing from

the parties concerning its subject matter jurisdiction over this action and the implication of

specific language in the insurance policy at issue (ECF Nos. 80, 81).  The Court denied

Plaintiff's motion for leave to file a sur-reply (ECF No. 77), but noted: "The Court concludes that

Plaintiff, in its brief in support of the instant motion, has adequately drawn the Court's attention

to authorities and arguments in Defendant's Reply to its Motion for Summary Judgement that it

believes the Court should review with a careful eye."  ECF No. 79 at PageID #: 4165.  For the

foregoing reasons, the Court denies Defendant's motion.

(4:19CV1008)

## I. Background[1]

This case concerns insurance coverage for a personal injury lawsuit ("Pennsylvania Civil Action") in Allegheny County, Pennsylvania, in which Plaintiff, and its former co-Plaintiffs, were named as defendants.  In the Pennsylvania Civil Action, Ryan Marshall, Sr. ("Marshall") sought to recover damages for personal injuries he sustained when a pipe that was being loaded onto a truck fell and crushed his legs while he was performing work on behalf of Plaintiff.  The injuries were so severe that Marshall's legs were amputated.

Plaintiff seeks defense and indemnity for the Pennsylvania Civil Action under a policy of commercial general liability insurance issued by Defendant.  Defendant defended Plaintiff in the Pennsylvania Civil Action under a reservation of rights, and the Pennsylvania Civil Action settled at mediation on August 7, 2019, only a few months after this litigation commenced.  ECF No. 23 at PageID #: 429.

### A. Parties

Plaintiff is a registered Ohio for-profit corporation that operates a full-service truck and motor carrier business throughout the United States.  Dura-Bond Industries ("Dura-Bond") manufactures and stores large industrial pipes at its facility in Duquesne, Pennsylvania, and it outsources its on-site hauling needs, which fluctuate daily.  Dura-Bond typically used Robert Wallace for its on-site hauling needs.  Around 2007, Wallace entered an independent contract

---

[1]  The background of this matter is not subject to dispute, and was well-described in Judge Limbert's Memorandum Opinion and Order (ECF No. 31), which resolved Defendant's then-pending motion for judgment on the pleadings.  Much of the background has been taken directly from that Memorandum Opinion and Order, with additional facts and citations added as needed.

(4:19CV1008)

agreement with Plaintiff and began to run his trucks under Plaintiff's operating authority.  Trucks

operating under Plaintiff's operating authority are driven by independent contractor drivers,

drivers of the trucking companies, or drivers provided by professional-employer organizations.

Pursuant to its federal and state regulatory requirements, Plaintiff must screen and approve

drivers and provide certain safety information and instruction for trucks to be driven under its

operating authority.  Drivers must also sign an independent contractor agreement which requires

drivers to provide their own insurance.

Dura-Bond hired Plaintiff to move freight around its facility using trucks bearing the

Plaintiff's placard and operating under Plaintiff's Federal Motor Carrier operating

authority.  Dura-Bond worked directly with Wallace on its daily hauling needs.  At times,

Wallace did not have sufficient drivers to handle Dura-Bond's workload.  In such a case, Wallace

would bring in a third party for drivers, including Sam Russell Trucking ("Russell Trucking").

Russell Trucking also had an independent contracting agreement with Plaintiff to operate its

trucks under Plaintiff's operating authority.  Under this arrangement, among other things,

Plaintiff leased trucks from Russell Trucking to perform the work required by Dura-Bond at its

facility.  Plaintiff received weekly logs, invoiced Dura- Bond, and then paid Wallace (or third

parties such as Russell Trucking) a percentage of the sum received from Dura-Bond.

Marshall was a former Dura-Bond employee, and applied to Russell Trucking to drive its

trucks as an independent contractor.  Plaintiff screened Marshall and approved him as a driver

with Russell Trucking for purposes of the work at Dura-Bond, subject to training by Russell

Trucking.  Marshall signed a Driver Lease Agreement with Russell Trucking wherein Marshall

3

(4:19CV1008)

noted that he was an independent contractor who was leasing one of Russell Trucking's trucks and that he was responsible for securing his own workers compensation coverage. On or about May 27, 2014, Marshall began driving Russell Trucking's trucks under Plaintiff's operating authority.

After his training was completed, Marshall's assigned job at the Dura-Bond facility was to drive truckloads of Dura-Bond pipe across the facility grounds. Marshall received his assignments and pay from Russell Trucking, and on-site Dura-Bond personnel[2] instructed Marshall where to transport the loads. Plaintiff was not involved in these daily operations and did not pay Marshall.

On June 27, 2014, while working at the Dura-Bond facility, Marshall sustained injuries that permanently disabled him. Marshall was standing outside his truck while Dura-Bond personnel loaded pipe onto the truck with a forklift. When a Dura-Bond employee was backing up in the forklift, he bumped into a pipe and the load fell, hitting Marshall and crushing his legs, which had to be amputated.

### B. Pennsylvania Workers Compensation and Indemnity Proceedings

Marshall filed several workers' compensation claim administrative petitions against Plaintiff, Russell Trucking, and the Pennsylvania Uninsured Employers Guaranty Fund ("UEGF"). The UEGF filed a petition to join Dura-Bond to the proceedings, which were

---

[2] The opinion in the workers' compensation proceeding noted that Marshall was given daily direction by a "Mr. McFarland," a worker whom Marshall thought was an employee of Dura-Bond, but who actually worked for Wallace Trucking. ECF No. 58-2 at PageID #: 959.

4

(4:19CV1008)

consolidated into a single proceeding.  The Workers' Compensation Judge ("WCJ") in the

workers' compensation proceeding found Russell Trucking to be Marshall's immediate

employer.  Russell Trucking did not have workers compensation insurance.  The WCJ further

found both Plaintiff and Dura-Bond to be Marshall's "statutory employers," which finding the

Pennsylvania Workers' Compensation Appeal Board affirmed.  A Pennsylvania statutory

employer meets the following five elements:

> (1) the entity is under contract with an owner or one in position of an owner; (2) the
> entity occupies or is in control of the premises [where the injury occurred]; (3) the
> entity entered into a subcontract; (4) the entity entrusted a part of its regular business
> to the subcontractor; and (5) the injured party is an employee of such subcontractor.

*Six L's Packing Co. v. W.C.A.B. (Williamson)*, 44 A.3d 1148, 1151 (Pa. 2012).

Neither Russell Trucking nor Plaintiff carried workers' compensation insurance in

Pennsylvania, but Dura-Bond did.  Dura-Bond, as required by law, has been paying for

Marshall's workers compensation claim, but subsequently asserted a right of indemnity against

Plaintiff in a civil action in Pennsylvania for the workers' compensation costs and expenses it

paid to Marshall related to the accident.

The Pennsylvania indemnity action has been largely resolved, but has been stayed

pending resolution and approval by a workers' compensation judge, of the division of medical

set-aside benefits between Marshall's employers and statutory employers.  ECF No. 81 at PageID

#: 4173-74.  Plaintiff explains, and the Court agrees, that, "as a practical matter, Marshall's

employment status would not have been litigated" in the indemnity proceeding.  *Id*. at PageID #:

4174.  The sole issue that remains pending in the Workers' Compensation case, the medical set-

aside, is irrelevant to the questions presented in this case concerning Marshall's employment

5

(4:19CV1008)

status.  Only benefits related to the Workers' Compensation proceedings are at issue in the

Pennsylvania indemnity action, which are separate from the damages asserted in this case.

### C.  Pennsylvania Civil Action

In December 2016, Marshall also filed a civil action in Pennsylvania state court against

Plaintiff and certain related individuals and affiliates, including Russell Trucking, Wallace, and

Dura-Bond.  Marshall sought compensatory and punitive damages for his injuries.  ECF No. 81

at PageID #: 4173-74.  The civil action was stayed in favor of the Workers Compensation

Proceeding.  _Id._  As indicated earlier, the parties settled the Pennsylvania Civil Action in

mediation on August 7, 2019, a few months after this lawsuit was filed.  _Id_. at PageID #: 4174.

Plaintiff's settlement of the claims against it was for $2.4 million.  Defendant issued a policy

("the Policy") of commercial general liability insurance to Plaintiff for the period from June 1,

2014 to June 1, 2015, under which Plaintiffs seek defense and indemnity for the Pennsylvania

Civil Action, but not the Workers' Compensation action or subsequent Pennsylvania indemnity

action.  The parties agree, and this Court has already held, that the Policy is governed by Ohio

Law.  ECF No. 31 at PageID #: 487.

### D.  The Federal Case

Plaintiffs filed a Complaint in the Court of Common Pleas in Trumbull County, Ohio,

which contained seven counts against Defendant and former co-Defendant TrueNorth

Companies, L.C. ("TrueNorth").  ECF No. 1-1.  In the Complaint, Plaintiff[3] asserted a

---

[3]  At the time, there were related co-Plaintiffs, although it was a matter of dispute
whether the co-Plaintiffs were insured under the Policy.  They voluntarily dismissed their

(continued...)

6

(4:19CV1008)

declaratory judgment count and an anticipatory breach of contract count against Defendant.  It

also asserted the following counts against former co-Defendant TrueNorth: Negligent

Misrepresentation, Professional Negligence/Negligent Procurement, Breach of Fiduciary Duty,

Breach of Contract, and Unjust Enrichment.  All claims against TrueNorth settled, and have been

dismissed.  ECF Nos. 28, 29.

Defendant removed the case from state court to the United States District Court for the

Northern District of Ohio.  ECF No. 1.  While this case was first assigned to the undersigned, it

was transferred to Magistrate Judge Limbert early on, before a Case Management Conference

was conducted, based on the parties' consent to the jurisdiction of a Magistrate Judge.  Non-

document assignment dated 5/6/2020; ECF Nos. 8, 9.  In accordance with the policies of this

District, the case was transferred back to the undersigned upon Judge Limbert's retirement, and

the parties have not renewed their consent to have this matter heard by a magistrate judge since

that reassignment.  *See* non-document order dated 7/6/2020 (citing General Order 2020-13).

### E.  Defendant's Motion for Judgment on the Pleadings and Motion for Summary Judgment

The parties appear to agree that the only remaining claims in this suit are the declaratory

judgment claim and counterclaim, and Plaintiff's anticipatory breach of contract claim.[4]  These

---

[3](...continued)
claims after Judge Limbert issued his Memorandum Opinion and Order (ECF No. 31),
denying Defendant's Motion for Judgment on the Pleadings.  ECF No. 40, 41.

[4]  The Amended Complaint also contained a claim for Reformation, brought by
Plaintiff *and* then-existing co-Plaintiffs, seeking reformation of the Policy to include the
then-existing co-Plaintiffs as insureds.  ECF No. 32 at PageID #: 514-15.  The stipulated

(continued...)

(4:19CV1008)

claims were re-asserted in the operative complaint, the Amended Complaint (ECF No. 32) and

Answer thereto (ECF No. 33).  It is on these claims that Defendant seeks summary judgment in

the instant motion.  This is not the first motion Defendant has brought to resolve those claims.

Defendant sought judgment on the pleadings, asserting that the application of one of two

exclusions in the Policy bars coverage.  Defendant raises the same exclusions in its Motion for

Summary Judgment: (1) the Workers' Compensation And Similar Laws exclusion and (2) the

Employer's Liability Exclusion.  ECF No. 13 at PageID #: 320; ECF No. 67 at PageID #: 3369.

As relevant here, in his Memorandum Opinion and Order resolving Defendant's Motion for

Judgment on the Pleadings, Judge Limbert explained that the Employer's Liability Exclusion

could not be resolved absent additional fact-finding, and so could not be resolved at the pleading

stage.  ECF No. 31 at PageID #: 495-96.  That Order did not discuss the Workers' Compensation

And Similar Laws exclusion, and did not resolve the parties' purely legal disagreement regarding

its application to this matter.[5]  Defendant urges this Court to grant summary judgment for it by

applying either of the two exclusions.

_____

[4](...continued)
dismissal which removed all other co-Plaintiffs from this litigation does not appear to
expressly address the still-existing Plaintiff's assertion of the Reformation claim against
Defendant.  The parties are encouraged to file a formal stipulation of dismissal of that
claim if it has resolved, as it appears to be.

[5]  The parties do not explain whey they did not seek clarification after realizing
that Judge Limbert's Order did not address this potentially dispositive issue, particularly
given that the headings in the Law and Analysis section of the Order suggest that the
omission may have been an oversight.  See ECF No. 31 at PageID #: 487 (beginning with
subheading "B").

8

(4:19CV1008)

The two exclusions at issue, and additional facts related to their application, are discussed in detail below.  Generally, the parties' dispute over the Workers' Compensation And Similar Laws exclusion centers on whether such an exclusion, under Ohio law, encompass damages arising from an insureds' failure to obtain Workers' Compensation coverage.  The dispute concerning the Employer's Liability exclusion centers on whether Marshall is an "employee" of Plaintiff as that term is defined in the policy and under Ohio law.  The main questions the parties invite the Court to answer regarding that dispute are (a) whether statutory employees are included in the generic definition of employee as Ohio courts have interpreted that term in insurance contracts and (b) even if Marshall would otherwise be considered an employee, whether he is a "temporary worker," a type of worker expressly excluded from the Policy's definition of employee.

Before turning to the merits, the Court must address the threshold issue of subject matter jurisdiction.  As relevant to that discussion, the Court notes that, as briefed, this case may raise two unsettled questions of Ohio state law: (1) Whether a generic Workers' Compensation exclusion encompasses damages related to an insureds' failure to obtain such required coverage; and (2) Whether a statutory employee is automatically a generic "employee" in Ohio insurance contracts.

## II.  Subject Matter Jurisdiction

"A federal court is not a general repository of judicial power; thus, it must satisfy itself that it has subject-matter jurisdiction over the dispute before it addresses the merits of the claims."  *Gross v. Hougland*, 712 F.2d 1034, 1036 (6th Cir. 1983).  Although it is clear that this

9

(4:19CV1008)

Court would typically have subject matter jurisdiction based on diversity, as the Court explained

in its October 6, 2020, Order to Show Cause:

> "[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995). The Declaratory Judgment Act is "an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Id.*, 515 U.S. at 287 (quoting *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 241 (1952)). Ultimately, "the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power." *Id.* (quoting *Wycoff*, 344 U.S. at 243).
>
> The Sixth Circuit has concluded that a District Court may abuse its discretion to consider actions for Declaratory Judgment when, at the time of filing, state courts are actively considering the same or similar factual questions, and when the legal questions at issue of state law on which there is little authority. *Bituminous Cas. Corp. v. J & L Lumber Co.*, 373 F.3d 807, 815 (6th Cir. 2004).

ECF No. 78 at PageID #: 4162-62. Subject matter jurisdiction had not been expressly addressed by

the parties or Judge Limbert before this case was transferred back to the undersigned. Because "just

as bad facts can make bad law, misdirected lawyering can do the same[,]" and "[t]here is little more

frustrating for a district court judge than to have the parties jointly lead you down a wrong, and

possibly unnecessary, path[,]" the Court invited the parties to address the potential lack of subject

matter jurisdiction. *AntennaSys, Inc. v. AQYR Techs., Inc.*, 976 F.3d 1374, 1376, 1382 (Fed. Cir.

Oct. 7, 2020); *see* ECF No. 78.

Defendant, in a curt filing that failed to cite to any binding authority or provide any

meaningful analysis, asserted that because damages have been asserted in excess of $75,000,[6]

---

[6] There is no dispute that there has always been complete diversity between the

(continued...)

(4:19CV1008)

that jurisdiction is mandatory: "Motor Express sued RLI, in pertinent part, for both declaratory

judgment and breach of contract. There remained complete diversity between the parties.

Moreover, Motor Express expressly pled damages in excess of $75,000. Based upon the

foregoing, there are, and always have been, pending damages claims in excess of $75,000

between parties with complete diversity in this action. This is dispositive of subject matter

jurisdiction." ECF No. 80 at PageID #: 4166-67 (citations omitted).

The Declaratory Judgement Act expressly provides that a court "*may* declare the rights ...

whether or not further relief is or could be sought." 28 U.S.C. § 2201(a) (emphasis added). How

to evaluate subject matter jurisdiction over cases which present claims both for declaratory

judgment and for damages has created a split amongst the Courts of Appeal. *See New England

Ins. Co. v. Barnett*, 561 F.3d 392, 395-96 (5th Cir. 2009) (discussing the four approaches). Some

Circuits do indeed provide for the dismissal or remand of claims for money damages when paired

with claims for declaratory relief, particularly where the claims are inexorably intertwined. *Id.*

The Sixth Circuit has not offered on-point guidance on its approach (more on that below).

At the time the case commenced, there was no daylight between the declaratory judgment

claim and the *anticipatory* breach of contract claim. Under Ohio law, both causes of action are

for money damages. *Gauthier v. Gauthier*, 2019-Ohio-4208 (Ohio Ct. Ap. 2019) (collecting

authorities supporting the award of money damages for a declaratory judgment claim). Adoption

---

[6](...continued)
parties. Plaintiff, and former co-plaintiffs, are domiciliaries of Ohio; Defendant is an
Illinois insurance company; and former co-defendant TrueNorth is an Iowa corporation.
ECF No. 1 at PageID #: 1; ECF No. 1-1 at PageID #: 5-6; ECF No. 32 at PageID #: 504-
05.

11

(4:19CV1008)

of Defendant's position would strip the permissive, and, at times prohibitive, nature of

jurisdiction under the Declaratory Judgment Act of meaningful practical effect.  There are few

cases or controversies between insurers and insureds sufficient to trigger Article III standing that

could not also be couched as an anticipatory breach of contract action.  The mere existence of

alleged damages in excess of $75,000 as a basis for mandatory jurisdiction makes even less sense

in this case, given that money damages are recoverable in declaratory judgment causes of action

in Ohio.  Accordingly, the Court is skeptical of Defendant's contention that jurisdiction over this

entire action is, or ever was, mandatory.  The three cases on which Defendant relies[7] base their

analysis, nearly exclusively, on the decisions of other District Courts, or the analysis of a specific

subset of Circuits other than the Sixth.

    The lone exception is a single citation in *Equity Planning*, which rested, in part, on the

Sixth Circuit's analysis in *Adrian Energy Assocs. v. Michigan Pub. Serv. Comm'n*: "When a

plaintiff seeks relief in addition to a declaratory judgment, such as damages or injunctive relief,

both of which a court *must* address, then the entire benefit derived from exercising discretion not

to grant declaratory relief is frustrated[.]" 481 F.3d 414, 422 (6th Cir. 2007) (emphasis in

original).

    While that sounds like a clearly applicable pronouncement in isolation, context renders

the "must" ambiguous.  "There is a crucial distinction between the claim the district court was

---

    [7] *Equity Planning Corp v. Westfield Ins. Co.*, No. 1:20-CV-01204, 2020 WL
5909806, *4-5 (N.D. Ohio Oct. 6, 2020); *Knowlton Constr. Co. v. Liberty Mut. Ins. Co.*,
No. 2:07-CV-0748, 2007 WL 4365690, *3 (S.D. Ohio Dec. 13, 2007); *Farris v. State
Farm Ins. Co.*, 617 F.Supp.2d 654, 659 (N.D. Ohio 2008).

(4:19CV1008)

required to address ('*must address*') in *Adrian* and the diversity-jurisdiction claims in the present case. The plaintiff's claims in *Adrian*, included a claim under the Federal Power Act. The district court had '*exclusive jurisdiction*' over that claim." *Heins v. Commerce & Indus. Insuranc Co., No. 3:17-CV-00110, 2017 WL 4784285, at *6 (S.D. Ohio Oct. 24, 2017)* (citations omitted, second emphasis added), *report and recommendation rejected on other grounds*, *Heins v. Commerce & Indus. Ins. Co.*, No. 3:17-CV-110, 2018 WL 514541 (S.D. Ohio Jan. 22, 2018). Because the passage relied on in *Equity Planning* "concerns exclusive, mandatory federal-court jurisdiction, it is distinguished from the present case in which both this Court and the state court have jurisdiction over" Plaintiff's anticipatory breach of contract claim. *Id.*[8]

Given the existing circuit split on this issue (and the nature of relief available for declaratory judgment actions in the state of Ohio) the Court is hesitant to adopt a mandatory rule. Such a rule would permit an influx of premature insurance disputes to the Federal Courts, some of which are substantively identical to cases the Sixth Circuit has concluded may never be accepted by a District Court.  Indeed, the Plaintiff in *Bituminous* had been defending its insured under a reservation of rights since before it commenced its federal litigation.  Would the result have been different if Plaintiff's counsel had formally sought compensation for those damages, rather than assuming the insured would repay them after the Court declared the rights of the parties?

---

[8] *See also* *Tibbitts v. Great N. Ins. Co.*, No. 2:20-CV-10029, 2020 WL 4333546, at *2 (E.D. Mich. July 28, 2020)* ("Plaintiff may be correct that *Adrian* did not create a bright-line rule requiring federal courts to maintain jurisdiction over declaratory judgment claims where a plaintiff also asserts damages claims[.]")

(4:19CV1008)

The Court need not reach the question of whether Defendant is correct that jurisdiction is mandatory because, as Plaintiff thoughtfully explained in its detailed response to the Court's Show Cause Order, the unique facts of this case weigh in favor of the Court's exercise of discretionary jurisdiction.

> Court[s] generally considers five factors to determine whether a case is appropriate for declaratory judgment:
>
> (1) whether the judgment would settle the controversy;
> (2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue;
> (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for *res judicata*";
> (4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and
> (5) whether there is an alternative remedy that is better or more effective.

*Bituminous Cas. Corp.*, 373 F.3d at 813 (quoting *Scottsdale Ins. Co. v. Roumph*, 211 F.3d 211 F.3d 964, 968 (6th Cir. 2000)). The Court analyzes "[s]ubject matter jurisdiction ... by examining the complaint as it existed at the time of removal[,]" *Harper v. AutoAlliance Int'l Inc.*, 392 F.3d 195, 210 (6th Cir. 2004), but notes that the factors weigh even more heavily in favor of retaining jurisdiction at this juncture, even if it would have been within the Court's discretion to remand the claims against Defendant at the time of filing.[9]

---

[9] At the time the case was removed, Plaintiff was pursuing claims for Negligent Misrepresentation, Professional Negligence/Negligent Procurement, Breach of Fiduciary Duty, Breach of Contract, and Unjust Enrichment against now-dismissed Defendant TrueNorth Companies, L.C. ECF Nos. 1-1 at PageID #: 23-29; 28 (Notice of Dismissal). Even if the Court were to assume that jurisdiction over the TrueNorth claims would been discretionary rather than mandatory, it is relatively clear that the proper outcome would have been to retain jurisdiction over the TrueNorth claims, even if the claims against TrueNorth had to be severed from the claims against RLI, had the claims against RLI

(continued...)

(4:19CV1008)

As to the first factor, like many insurance disputes, at the time of removal, resolution of this action would not have settled the entire controversy.[10]  Neither Marshall nor the other statutory/potential employers who might have and ultimately did seek indemnity against Plaintiff for Marshall's damages were parties to the action, and thus could have pursued a third-party recovery directly against Defendant.  Accordingly, at the time of removal, this factor weighed against the exercise of jurisdiction.

As to the second factor, declaratory relief would serve some purpose in clarifying the legal relations at issue.  As applied to the facts of this case, the factor is neutral.  While, like the first factor, there are some arguments cautioning that this factor might weigh against the exercise of jurisdiction, because the relationship between Marshall and Plaintiff would not be clarified for the purposes of any action involving Marshall.  However, what differentiates this case from many insurance declaratory judgment actions is that a declaration of Plaintiff's rights *vis a vis* its insurer is important not only for Plaintiff and Defendant themselves, but also for former co-Defendant TrueNorth, Plaintiff's broker, who was alleged to have secured a deficient policy for Plaintiff.

---

[9](...continued)
been appropriate to remand.  That the case would have remained in federal court for adjudication of the TrueNorth claims weighs in favor of retaining jurisdiction over the entire action.

[10]  Given that those underlying claims have settled, and the Court has not received any information suggesting that the underlying settlements remain unpaid, resolution of the declaratory judgment claim would resolve what appears to be the only remaining controversy.

(4:19CV1008)

The third factor weighs in favor of exercising jurisdiction.  The Court sees no suggestion that this lawsuit was filed (or removed) to facilitate some *res judicata* race, rather than to appropriately clarify which entity was responsible not only for the costs of defending the underlying Pennsylvania Civil Action.  The parties also had a reasonable desire to resolve who was responsible for negotiating the payment of a multi-million dollar settlement.  This is particularly true given that, as discussed below, the key factual findings were made in 2016 in the Worker's Compensation Action, rather than in the Pennsylvania Civil Action itself.  "[C]ourts consistently refuse to infer procedural fencing when the declaratory judgment action is filed years after the competing state proceedings."  *Minnesota Lawyers Mut. v. John P. Hildebrand Co., LPA*, No. 1:13-CV-845, 2014 WL 1050911, at *6 (N.D. Ohio Mar. 17, 2014) (collecting cases).

When evaluating the fourth factor, to determine whether the exercise of jurisdiction would increase friction between federal and state courts, the Sixth Circuit has identified three sub-factors for courts to consider: "(1) whether the underlying factual issues are important to an informed resolution of the case; (2) whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and (3) whether there is a close nexus between the underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action."  *Bituminous Cas. Corp.*, 373 F.3d at 814–15 (quoting *Scottsdale*, 211 F.3d at 968).

The unique facts of this case are brought into sharp relief in the evaluation of this factor. The Court notes that the inquiry seems to presume that the underlying state court action in which relevant facts were to be found was brought (a) in the same state as the claim for declaratory

16

(4:19CV1008)

relief and (b) in a forum competent to determine the rights of the insurer *vis a vis* the insured. The Court begins its analysis by pointing out that neither is true here, which the Court finds weighs strongly in favor of exercising jurisdiction.

As to the first sub-factor, the underlying factual issues are, of course, critical to an informed resolution of this case.  However, the facts concerning the relationship between Mr. Marshall and Plaintiff were not to be found by the Court in the underlying state court action, but rather by the Pennsylvania Worker's Compensation Judge, who could not have resolved the coverage issue now before the Court,[11] and who issued his factual findings on November 1, 2016, two and a half years before this case was filed.  ECF No. 4-2 at PageID #: 191.  Indeed, the court in the Pennsylvania Civil Action stayed the case pending resolution of the Worker's Compensation matter, which was appealed, and would determine which, if any, defendants had a duty to procure Workers' Compensation coverage for him and had failed to do so, which would deprive them of otherwise applicable dispositive defenses.

It was critical to the Pennsylvania Civil Action only that Plaintiff (a) was Marshall's actual *or* statutory employer and (b) failed to ensure that Worker's Compensation coverage would be available if Marshall were injured.  However, it was far from a foregone conclusion that the specific nature of the relationship between Marshall and Plaintiff beyond those facts would be decided by the trial court, as it was the fact, but not necessarily the nature of, Marshall's employment that permitted the Pennsylvania Civil Action to proceed.  Certainly the

---

[11]  This is true both due to the WCJ's limited authority, and because the Pennsylvania Civil Action, for which Plaintiff seeks indemnification and defense, had not yet commenced.

17

(4:19CV1008)

trial Court would have made no additional findings relevant to the Court's consideration of the

Workers' Compensation And Similar Laws exclusion.  Having reviewed the complaint filed in

the Pennsylvania Civil Action (ECF No. 58-1), the Court concludes that it would be, at best,

unlikely that trial court would have made factual conclusions that would be outcome-

determinative, or even helpful, regarding whether Marshall was "furnished" to Plaintiff to "meet

short term working conditions[,]" two key inquiries in resolving the Employer's Liability

exclusion.  As Plaintiff puts it: "Although the issue of whether Marshall was PI&I's employee

could have ultimately been litigated in the civil action, it never was because the action was stayed

in favor of the Workers' Compensation Action[.]"  ECF No. 81 at PageID #: 4174.

Turning to the second sub-factor, whether the state trial court is in a better position to

evaluate those factual issues than is the federal court, while "both the issue of [Marshall's]

employment status and the issue of the insurance contract interpretation are questions of state

law[,]" a Pennsylvania trial Court is not "more familiar" with Ohio insurance law than this Court,

"and, therefore, [is not] better able to resolve[]" the unsettled questions raised by the parties.

*Bituminous Cas. Corp.*, 373 F.3d at 815.

The third and final sub-factor, whether there is a close nexus between the underlying

factual and legal issues and state law and/or public policy, or whether federal common or

statutory law dictates a resolution of the declaratory judgment action, weighs slightly against the

exercise of jurisdiction.  Both worker's compensation and insurance law implicate important

state policy concerns.  This factor also does not necessarily require an assessment of the interests

of the state court which engaged in the fact-finding, but could allow for consideration of the

(4:19CV1008)

interests of the Ohio court from which this case was removed.  While Pennsylvania courts have

little interest in the application of Ohio insurance contracts, the underlying legal questions plainly

implicate significant issues of Ohio public policy, and interpretations of state law, which weighs

in favor of resolution in a state court.  That said, the interplay between two state statutory

schemes, *i.e.* the Pennsylvania statutory employer definition, and Ohio insurance law, is an area

that a federal court is uniquely suited to address.

      Furthermore, as discussed in detail below, it is not a foregone conclusion that this Court

must reach the unsettled questions of law the parties put before it.  Due to specific facts about the

Policy, the application of the Workers' Compensation exclusion to the facts of this case is easily

resolved using settled state law, without any need for the Court to reach unsettled questions best

left for another case, and potentially another court.  Similarly, whether or not Ohio courts would

consider a statutory employer to automatically be an employer may not need to be resolved, as

there are avenues for conclusively determining whether or not Marshall is an employee under the

policy without relying on his status as a statutory employee.[12]  If the Court does need to reach that

question, the Court also has avenues available to it to ensure that the correct result is reached,

such as by certifying a question to the Ohio Supreme Court.

      Finally, the Court concludes, as to the fifth factor, that there is not another remedy which

is better or more effective.  Typically, the better or more effective remedies considered by federal

courts are either a third-party claim brought as a part of the underlying action, or a declaratory

---

[12]  As discussed *infra*, a finder of fact will likely need to find facts that resolve the
question of whether Marshall was a traditional employee before his status as a statutory
employee will be relevant.  That evaluation will be conducted under settled Ohio law.

(4:19CV1008)

judgment action brought in the same court after the underlying case is resolved.  Neither would

be adequate here.  While the Pennsylvania trial court would certainly be capable of resolving

either a third-party indemnity claim or a breach of contract claim under Ohio law, the court

cannot conclude that such a remedy would be better.  Although an Ohio state court would be

better equipped to address the single, novel, issue of state law which may need to be resolved, the

Court might have needed to reach those questions regardless, had it retained, or been required to

retain, jurisdiction over the claims against former co-defendant TrueNorth, against whom no

declaratory claim for relief was made.  Accordingly, at the time of removal, both judicial

economy and comity would have weighed strongly in favor of the exercise of jurisdiction over all

claims initially brought, as severance and remand would have invited potentially conflicting

judgments.  Looking to the current state of the case, even if this Court were later in a position to

certify a question to the Ohio Supreme Court, doing so would still be more efficient than

remanding this matter to state court, forcing the parties to begin the litigation anew before a

judge unfamiliar with the dispute.

Based on this evaluation, the Court concludes that it has discretion to exercise jurisdiction

over this case, and will continue to exercise it.  While the Court has weighed these factors based

on the circumstances of the case at the time of removal, the Court notes that, unlike in

*Bituminous*, the relevant underlying state litigation is long-resolved, which only further cautions

against remand at this late stage.  *See Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 86

(2d Cir. 2018) ("[J]udicial economy, convenience, fairness, [nor] comity" served by late remand

of case the parties had invested years and significant resources into litigating.)  "After all, as the

20

(4:19CV1008)

very first Rule of Civil Procedure provides, procedure in the district courts is meant 'to secure the just, speedy, and inexpensive determination of every action and proceeding.'" *Id.* (quoting Fed. R. Civ. P. 1).

### III. Standard of Review

Summary judgment is appropriately granted when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Karnes*, 398 F. 3d 868, 873 (6th Cir. 2005). The moving party is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies on the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial." *Guarino v. Brookfield Twp. Trs*, 980 F. 2d 399, 403 (6th Cir. 1992).

Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. An opposing party may not simply rely on its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox. v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). To defeat the motion, the non-moving party must "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." *Guarino*, 980 F.2d at 403. In reviewing a motion for summary judgment, the Court views the evidence in the light

21

(4:19CV1008)

most favorable to the non-moving party when deciding whether a genuine issue of material fact

exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Aickes*

*v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

"The mere existence of some factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment . . . ."  *Scott v. Harris*, 550 U.S. 372,

380 (2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The fact

under dispute must be "material," and the dispute itself must be "genuine."  A fact is "material"

only if its resolution will affect the outcome of the lawsuit.  *Scott*, 550 U.S. at 380.  In

determining whether a factual issue is "genuine," the Court assesses whether the evidence is such

that a reasonable jury could find that the non-moving party is entitled to a verdict.  *Id.*

("[Summary judgment] will not lie . . . if the evidence is such that a reasonable jury could return

a verdict for the non-moving party.").

## IV.  Analysis

Defendant contends it is entitled to summary judgment based on the application of one of

two exclusions in the Policy: (1) the Workers' Compensation And Similar Laws Exclusion and

(2) the Employer's Liability Exclusion.  Defendant would be entitled to summary judgment on all

claims if it could establish that either exclusion applied to the undisputed facts of this case.

Under settled Ohio Law, "[a]n insurer who claims that a policy exclusion prohibits insurance

coverage must show that the exclusion specifically applies[, and e]xclusions of coverage must be

clear and unambiguous to be enforceable."  *Neal-Pettit v. Lahman*, 928 N.E.2d 421, 424 (Ohio

St. 2010) (citations omitted).

22

(4:19CV1008)

## A.  Workers' Compensation And Similar Laws Exclusion

The Policy excludes "[a]ny obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law." ECF No. 58-6 at PageID #: 1112.  The parties disagree on whether this language encompasses liabilities that could have been avoided had the insured obtained the legally required coverage.  Plaintiff notes that "medical and wage benefits[,]" which would have been covered under a workers' compensation policy had one been obtained, "were paid as part of the workers' compensation settlement agreement and are not being sought from RLI herein."  ECF No. 69 at PageID #: 3981.  Plaintiff explains that the coverage it seeks are for damages paid to Marshall "that he could not recover in the workers' compensation proceeding, including pain and suffering[.]"  *Id.*

The plain text of the exclusion is, at best, ambiguous as to its application to the facts of this dispute.  In interpreting identical or similar language, many states have, as a policy matter, interpreted the language as Defendant urges, as a means of encouraging insureds to obtain appropriate workers' compensation coverage, recognizing that the purpose of Commercial General Liability polices is not typically to provide coverage for injuries sustained by injured workers.  *See Brown v. Indiana Ins. Co.*, 184 S.W.3d 528, 534-35 (Ky. 2005) (collecting cases).  The parties have not provided, and, at this writing, the Court has not located, any directly on-point authority from Ohio on this issue.

The Court need not reach the novel question of how the Ohio Courts might interpret this language in isolation, however, due to well-settled principle of contract interpretation, as adopted by Ohio state courts, that, "[i]n construing a contract, a court [] must give meaning to every

23

(4:19CV1008)

paragraph, clause, phrase and word, omitting nothing as meaningless, or surplusage[.]" *Affiliated FM Ins. Co. v. Owens-Corning Fiberglas Corp.*, 16 F.3d 684, 686 (6th Cir. 1994) (citing *Heifner v. Swaney*, 1992 WL 198120 (Ohio App. Aug. 27, 1992)).[13]

A provision in the Policy, pertaining to coverage not at issue in this case, contains *both* the "Workers' Compensation and Similar Laws" exclusion, and a related exclusion:

> **Failure To Comply with "Workers' Compensation Law"**
> "Bodily injury by accident" or "bodily injury by disease" to an "employee" when you are:
> (1) Deprived of common law defenses; or
> (2) Otherwise subject to penalty;
> because of your failure to secure your obligations or other failure to comply with any "workers' compensation law".

ECF No. 58-6 at PageID #: 1131.  To conclude that, within the four corners of the Policy, that the Workers' Compensation and Similar Laws exclusion encompass damages resulting from a failure to obtain such required coverage would render the Failure To Comply exclusion meaningless surplusage.  Defendant, of course, was free to include the Failure to Comply exclusion in other provisions of coverage.  Had Defendant included the Failure to Comply exclusion in the section of the policy at issue, this case would be easily resolved.

Defendant's argument to the contrary is unpersuasive.  In an effort to avoid the conclusion that the Court reaches today, Defendant asserts that Plaintiff was deprived of a statutory, rather than common law, defense, and that "penalty" should be read to mean

---

[13]  Furthermore, "[a]uthorities without number can be cited to support the rule that doubtful language in a contract is to be interpreted most strongly against the party who used it or the party who prepared the contract."  *O'Neill v. German*, 154 Ohio St. 565, 571, 97 N.E.2d 8, 11 (1951).

(4:19CV1008)

government-imposed fines, but not broader consequences.  ECF No. 80 at PageID #: 4170.

Setting aside that the Failure to Comply exclusion would still be surplusage under Defendant's

reading, just to a potentially narrower class of damages, by use of the word "otherwise[,]" the

policy contemplates that the deprivation of a common law defense is comparable to a penalty,

supporting a broader reading of "penalty than Defendant urges.  The Court finds no material

distinction between the deprivation of a common law defense and a statutory defense in this

context.  The reading of "otherwise" to indicate similarity of kind within a list is consistent with

other policy provisions, *i.e.* "join us as a party or otherwise bring us into a 'suit[.]'" ECF No. 58-

6 at PageID #: 1122.  Moreover, as Workers' Compensation schemes are creatures of statute,

Defendant's reading would, as a practical matter, strip the exclusion of most of the effects a

reader would expect.  Finally, the Court notes that, in Ohio, Workers' Compensation immunity

does not arise exclusively from statute.  *See, e.g.*, O. Const. II Sec. 35.

The Court rejects Defendant's interpretation of the Workers' Compensation and Similar

Laws exclusion.  Accordingly, Defendant is not entitled to summary judgment based on the

application of that exclusion.

### B.  Employer's Liability Exclusion

The Policy excludes:

**e. Employer's Liability**

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or
(b) Performing duties related to the conduct of the insured's business; or

(4:19CV1008)

>(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

>This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

>This exclusion does not apply to liability assumed by the insured under an "insured contract".

ECF No. 58-6 at PageID #: 1112-13.

The Policy explains that the definition of "'Employee' includes a 'leased worker' *[but] does not include a 'temporary worker'*." ECF No. 58-6 at PageID #: 1124 (emphasis added).[14] A "'Temporary worker' means a person who is furnished to you to substitute for a permanent 'employee' on leave or to meet seasonal or short-term workload conditions." *Id*. at PageID #: 1127.[15]

---

[14] The undersigned notes, that Judge Limbert previously concluded that the policy "narrowly define[s 'employee'] to include *only* a 'leased worker[.]'" ECF No. 31 at PageID #: 493 (emphasis added). The undersigned concludes law of the case principles do not require the undersigned to proceed with that narrowing construction of "employee." The natural reading of the policy dictates that employee include both leased workers *and* the natural definition of employee as used in Ohio insurance contracts, but specifically excludes temporary workers, regardless of whether the temporary worker would otherwise be classified as an generic employee or leased worker. The undersigned need not, and does not, make any finding regarding whether statutory employees are automatically included in the definition of "employee" in Ohio insurance contracts.

[15] A "'Leased worker' means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business." ECF No. 58-6 at PageID #: 1125. Like the definition of employee, temporary workers are expressly excluded from the definition of leased workers. *Id.*

26

(4:19CV1008)

Accordingly, if Marshall were properly categorized as a temporary worker, Plaintiff would be entitled to coverage, regardless of whether Marshall might otherwise qualify as an employee.

Plaintiff devotes significant briefing to arguing that Marshall was not its employee of any kind, as that term is defined under Ohio law in insurance contracts that otherwise lack a definition.  Plaintiff argues that the Court should independently evaluate whether Defendant can demonstrate, at this stage, that Ohio's fact-specific "control test" is satisfied.[16]  Cabining the issue of temporary employee status, Defendant argues that Marshall's status as a statutory employee brings him under the umbrella of the term "employee."  Defendant further asserts: "This Court has already correctly held as much."  ECF No. 76 at PageID #: 4140 (citing ECF No. 31 at PageID #: 487-96).

The undersigned has carefully reviewed Judge Limbert's Memorandum Opinion and Order addressing Defendant's earlier motion for judgment on the pleadings, and concludes that

---

[16]  The Ohio Supreme Court has explained that "employee" has a plain and ordinary meaning, which should be applied by courts interpreting insurance contracts: "[a] person in the service of another * * *, where the employer has the power or right to control and direct the employee in the material details of how the work is to be performed. * * * One who works for an employer; a person working for salary or wages." *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 686 (Ohio 1995) (quoting Black's Law Dictionary (6 Ed.1990) 525).  Ohio "case law makes clear that in determining who has the right to control the work, [courts] must look at the individual facts of a case."  *State ex rel. Nese v. State Teachers Ret. Bd. of Ohio*, 991 N.E.2d 218, 226 (Ohio 2013).  "The factors to be considered  include, but are certainly not limited to, such indicia as who controls the details and quality of the work; who controls the hours worked; who selects the materials, tools and personnel used; who selects the routes traveled; the length of employment; the type of business; the method of payment; and any pertinent agreements or contracts."  *Id.* (quoting *Bostic v. Connor*, 524 N.E.2d 881 (Ohio 1988)).

(4:19CV1008)

Defendant has overstated the prior conclusions of the Court.  Judge Limbert noted that out of

district (and out of state) cases addressing whether a statutory employee qualified an employee

for the purposes of an insurance contract might appear to guide the Court's analysis, but were

off-point because of the Policy's discussion of temporary and leased workers, and the obvious

ambiguity surrounding whether Marshall might qualify as a temporary worker.  ECF No. 31 at

PageID #: 493-95.  That decision did not conclude that statutory workers are necessarily

employees, if they are not temporary workers.

Judge Limbert further explained: "Plaintiff has provided plausible facts, taken as true,

that Marshall could be considered a 'temporary employee' under the Policy, so that the

Employer's Liability Exclusion would not apply; that is all that is required to deny RLI's motion

for judgment on the pleadings."  Id. at PageID #: 496.  Defendant is similarly not entitled to

summary judgment because the evidence submitted does not conclusively defeat Plaintiff's

argument that, if Marshall is an employee of any kind, he was only a temporary worker.

There are two disputes concerning whether Marshall was a temporary worker.  First,

whether he was "furnished" by a third party, and second, whether any such furnishment was to

meet "short term workload conditions."

As to "furnished," Plaintiff argues that, as they were not, or at least have not yet been

found to be, Marshall's actual or joint employer, that Marshall was furnished to it by Russell.

Unlike the Policy's definition of 'leased worker," which discusses workers "leased to you *by a

labor leasing firm*[,]" ECF No. 58-6 at PageID #: 1125 (emphasis added), the policy does not

require that a "temporary worker" be "furnished" by anyone in particular.  Indeed, that Plaintiff

28

(4:19CV1008)

was found to be Marshall's statutory employer supports their position, as the requirements of

statutory employment expressly contemplate that the individual is an employee of another entity,

a subcontractor. The question of whether Marshall was "furnished" will rise and fall on the same

or similar facts as whether he was an actual (as opposed to statutory) employee of Plaintiff. The

Court will not rewrite the policy as Defendant urges to conclude that an individual must be

furnished specifically by a staffing agency. Whether Marhsall was a traditional employee is a

fact-intensive inquiry that is not properly resolved by the Court at this juncture.[17]

As to whether Marshall's work for Plaintiff was "to meet short term workload

conditions," Defendant repeatedly asserts that Plaintiff is bound by the WCJ's factual finding

that *Marshall's* work for Defendant was "regular and recurrent." ECF No. 67 at PageID #: 3382;

ECF No. 76 at PageID #: 4140. Again, this is an overstatement of the findings of the WCJ, and,

while it is an arguable interpretation of the record as a whole, that is insufficient at this stage of

the litigation. What the WCJ concluded was that "the driving of trucks" was a regular and

recurrent aspect of Plaintiff's business. ECF No. 58-2 at PageID #: 974. That Marshall was used

to complete that work for one month before the injury ended his career does not speak to whether

Marshall's work for Plaintiff, as opposed to Plaintiff's general use of subcontractors to obtain

trucks and drivers, was inherently "regular and recurrent" as opposed to "to meet short-term

workload conditions."

---

[17] Despite Defendant's assertion that the Workers' Compensation Judge found
that "the evidence was sufficient to establish that Motor Express was a 'joint employer of
Mr. Marshall[,]'" ECF No, 76 at PageID #: 4152, what the WCJ actually stated was that
"[t]he proofs arguably show" that Plaintiff was Marshall's actual or joint employer, ECF
No. 58-2 at PageID #: 976-77. That argument remains a live, and fact-intensive issue.

(4:19CV1008)

Whether Marshall was furnished "to meet short-term workload conditions" remains an open question on this record. Marshall applied to work for Russell in April 2014, and began his training on May 27, 2014. Marshall suffered his career-ending injuries only a month later, on June 27, 2014. While his employment was of short duration, what his work for Plaintiff was intended to be remains a disputed question of material fact.

Defendant asserts that its position is proven because "Motor Express work at Dura-Bond was fairly steady." ECF No. 67 at PageID #: 3386.[18] Even if Defendant had conclusively demonstrated that the work *outsourced to Russell and assigned to Marshall* was "steady," which it has not, that would hardly be the silver bullet Defendant asserts. Take the other example of temporary worker defined in the exclusion, a seasonal worker. A seasonal worker has work that is steady in that it predictable and anticipated to recur, but is still not a permanent employee. Such a worker still expressly falls outside of the definition of employee. So too here.

---

[18] Defendant notes that its position is supported by document production detailing Plaintiff's work at the Dura-Bond site, some of which it acknowledges it has not provided to the Court. ECF No. 67 at PageID #: 3387 n.25. The Court presumes that the "preliminary data" Defendant refers to was provided to the Court at ECF No. 66. This exhibit is an extensive spreadsheet that the parties elected to provide to the court in a printed, disjointed, form, rather than any kind usable format. The Court will not piece together and decode a 330 page jigsaw puzzle without guidance from the parties regarding its significance, or even what data it represents. In any event, the title of the document reflects that it details all of Plaintiff's work at the Dura-Bond facility. The Court can identify no delineation of work that was outsourced to Russell or assigned to Marshall specifically. While it is possible that an analysis of the document might yield information concerning fluctuations (or lack thereof) in the total amount of work Plaintiff had at the Dura-Bond site, it is Defendant's burden to prove its entitlement to summary judgment.

(4:19CV1008)

Plaintiff has put forth evidence that Wallace used Russell trucks to supplement his own fleet of three drivers when the work became too much for them to handle alone.  Wallace Dep., ECF No. 62 at PageID #: 2038.  While "[m]ost of the time [Wallace's] drivers would take care of hauling pipe off the – off the coating mill ... other times when we needed help, it would mostly be because they would have pipe coming in via rail or barge, and they would have to get that unloaded and set up for them to also schedule the coating for it.  So those are the time when we would need extra – extra help."  Id. at PageID #: 2038-39.  Wallace explained that he did not hire additional employees himself because the "industry comes in waves."  Id. at PageID #: 2039.  According to Wallace, it didn't make sense for him to hire more people and buy more equipment for short periods of time when work was heavy.  Id.  While Wallace worked with Russell for multiple years, "it wasn't like it was a – a total full year[,]" rather, Wallace testified, it was for "so many months here, maybe a couple of weeks there."  Id. at PageID #: 99.  At the time Marshall was working, Plaintiff argues, that need was high – 50-60% of the time because Wallace was "very busy" with the Dura-Bond work.  ECF No. 69 at PageID #: 3977 (citing ECF No. 62 at PageID #: 2038).

Russell's widow, who did the bookkeeping for Russell Trucking, testified that she had personal knowledge of the work at Dura-Bond, and similarly explained that the work was not constant – that Wallace had enough drivers to complete the work on a day-to-day basis, and that Russell drivers were not there daily like Wallace drivers were.  See Mrs. Russell Dep., ECF No. 63 at PageID #: 2818.  Furthermore, Dura-Bond work sent to Russell would not even necessarily be given to Marshall.  Sometimes the Russells' son, Maurice, would be called first.  Id. at PageID

(4:19CV1008)

#: 2825.  Russell was able to turn down individual assignments, *id*. at PageID #: 2820, Marshall

was able to drive for other companies if opportunities presented themselves, *id*. at PageID #:

2822, and, indeed, Mrs. Russell testified that Russell's work at Dura-Bond would not have

continued even if there had not been an accident, because around that time Wallace did bring in

more of his own trucks, which is consistent with his representations that he was particularly busy

in the year that Plaintiff was injured, *id*. at PageID #: 2794, 2822.[19]

Defendant has put forth evidence supporting its argument that some of the above-

described Plaintiff's evidence should not be credited.  Defendant views the above-described

evidence as self-serving and inconsistent with Plaintiff's positions taken in earlier, related

litigation, as well as Marshall's own understanding of his employment.

Credibility is a question for the jury.  Hearing the above testimony, a jury could

reasonably conclude that Marshall's work for Plaintiff was for short-term assignments, even if

those assignments were likely to come up multiple times a year.  Indeed, given Wallace's plans

to increase his own fleet, and Russell's expectation that the Dura-Bond contract, which was the

only contract Plaintiff worked on, would not continue, a jury could conclude that Marshall was

only to work with Plaintiff for a single short-term assignment.  Accordingly, Defendant is not

entitled to summary judgment.

---

[19]  Although Mrs. Russell testified that Marshall was not exclusively hired by
Russell to work at the Dura-Bond site, neither party has presented evidence that he
worked, or was scheduled to work, on any non-Dura-Bond jobs, and, indeed, as
Defendant points out, Marshall worked for Dura-Bond directly at the time he approached
Russell about driving.  ECF No. 67 at PageID #: 3387.

(4:19CV1008)

## V. Conclusion

For the reasons stated herein, Defendant's Motion for Summary Judgment is denied.

IT IS SO ORDERED.

  November 9, 2020                             /s/ Benita Y. Pearson
Date                                         Benita Y. Pearson
                                             United States District Judge